# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:          2022AP1468

---

Complete Title of Case:

**ASSOCIATED BUILDERS & CONTRACTORS OF
WISCONSIN, INC., COMMERCIAL ASSOCIATION OF
REALTORS WISCONSIN, INC., NAIOP WISCONSIN
CHAPTER, INC., WISCONSIN BUILDERS ASSOCIATION,
AND WISCONSIN REALTORS ASSOCIATION, INC.,**

　　　　**PLAINTIFFS-APPELLANTS,**

　　　**V.**

　　**CITY OF MADISON,**

　　　　**DEFENDANT-RESPONDENT.**

---

| | |
|---|---|
| Opinion Filed: | October 5, 2023 |
| Oral Argument: | April 26, 2023 |

---

| | |
|---|---|
| JUDGES: | Kloppenburg, P.J., Blanchard, and Graham, JJ. |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Richard M. Esenberg*, *Lucas T. Vebber*, *Anthony F. LoCoco*, and *Luke N. Berg* of the *Wisconsin Institute for Law & Liberty*, Milwaukee.  There was oral argument by *Lucas T. Vebber*. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of and oral argument by *Kate M. Smith*, assistant city attorney of Madison. |

Amicus
ATTORNEYS:      A nonparty brief was filed on behalf of American Bird Conservancy, Wisconsin Society for Ornithology, and Madison Audubon Society by *Peter E. McKeever*, of *Law Office of Peter E. McKeever*, Monona, and *William F. Sheehan*, of *American Bird Conservancy*, Washington, D.C.

COURT OF APPEALS
DECISION
DATED AND FILED

October 5, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1468**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021CV1729

**IN COURT OF APPEALS**

---

ASSOCIATED BUILDERS & CONTRACTORS OF
WISCONSIN, INC., COMMERCIAL ASSOCIATION
OF REALTORS WISCONSIN, INC., NAIOP WISCONSIN
CHAPTER, INC., WISCONSIN BUILDERS ASSOCIATION,
AND WISCONSIN REALTORS ASSOCIATION, INC.,

    PLAINTIFFS-APPELLANTS,

  V.

CITY OF MADISON,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: NIA TRAMMELL, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

¶1    GRAHAM, J. WISCONSIN STAT. ch. 101 (2021-22)[1] contains a number of provisions that pertain to the adoption of a statewide commercial building code. *See, e.g.*, WIS. STAT. § 101.02(15)(j) (directing the state department of professional services to adopt a statewide commercial building code); *see also* WIS. ADMIN. CODE chs. SPS 361-366 (July 2023)[2] (adopting the statewide code consistent with the direction and grant of authority in § 101.02(15)(j)). This appeal concerns one such provision, § 101.02(7r)(a), which the parties agree was adopted to prevent local governments from enacting or enforcing building code standards that are stricter than the statewide commercial building code. That paragraph provides, in relevant part, that "no county, city, village, or town may enact or enforce an ordinance that establishes minimum standards for constructing, altering, or adding to public buildings or buildings that are places of employment unless that ordinance strictly conforms to the applicable rules under sub. (15)(j)."

¶2    The question presented in this appeal is whether a City of Madison ordinance that was enacted to mitigate the risk of bird collisions, and that mandates the use of specified design features in the construction and development of specified types of buildings, is preempted by WIS. STAT. § 101.02(7r)(a). For the reasons set forth below, we conclude that it is not. We therefore affirm the circuit court order that granted summary judgment in the City's favor and dismissed this lawsuit.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] All references to the WIS. ADMIN CODE chs. 361-366 are to the July 2023 register unless otherwise noted.

## BACKGROUND

¶3      The City of Madison is said to be located within one of the largest flyways of migratory birds in the world.  Local groups estimate that tens of thousands of birds are injured or killed every year as they attempt to migrate through the City and collide with glass surfaces, which birds do not always perceive as a barrier.

¶4      The Madison Common Council responded to the problem by adopting MADISON GENERAL ORDINANCE § 28.129 (the "Bird-Safe Glass Ordinance" or the "Ordinance"), which was signed by the mayor and went into effect on October 1, 2020.  CITY OF MADISON, WIS. CODE OF ORDINANCES (2023) ("MGO").[3]  It is not disputed that the City followed the procedures set forth in WIS. STAT. § 62.23(7)(d), which are required for enacting zoning ordinances, when it enacted the Ordinance.

¶5      The Ordinance is titled "Bird-Safe Glass Requirements," and its stated purpose is to "reduce the heightened risk for bird collisions with glass on specified building designs and configurations."  MGO § 28.129(1).  The Ordinance applies to "all exterior construction and development activity, including the expansion of existing buildings," and it requires the treatment of glass on certain types of designs and configurations.  *See* § 28.129(2).[4]

_____

[3] All references to ordinances in this opinion are to the online register of the CITY OF MADISON, WIS. CODE OF ORDINANCES (last updated Sept. 18, 2023).  The parties refer to City of Madison ordinances as Madison General Ordinances and we follow their lead.

[4] Specifically, the Ordinance's treatment requirements apply to all glass on above-ground bridges that are connected to the building, *see* MGO § 28.129(4)(b), and all at-grade glass features, *see* § 28.129(4)(c).  Additionally, for buildings over 10,000 square feet, the Ordinance imposes

¶6      The Ordinance identifies several permissible methods for treating glass to increase its visibility and reduce the risk of bird collisions.   MGO § 28.129(4).  Glass may be treated with a "pattern of visual markers" of specified size and spacing.[5]  *Id.*  Alternatively, other mitigation measures may be used, including "low reflectance opaque materials"; "building-integrated structures" such as "non-glass double skin façades, metal screens, fixed solar shading, exterior insect screens, [or] other features that cover the glass surface; or any similar mitigation treatments" that are approved by the City's zoning administrator.  *Id.*

¶7      In July 2021, a consortium of five membership-based trade associations ("the Associations") filed a complaint against the City, which sought a declaration from the circuit court that the Ordinance is preempted by Wis. Stat. § 101.02(7r)(a) and an injunction enjoining enforcement of the Ordinance.[6]  The City answered the complaint, and the parties filed cross-motions for summary judgment.  The parties agreed that there were no disputes of material fact and that their motions presented questions of law.

¶8      The Associations argued that the Ordinance is preempted by Wis. Stat. § 101.02(7r)(a) because the Ordinance establishes "minimum standards for

different requirements based on the percentage of building surface that is comprised of glass.  *See* § 28.129(4)(a).

[5] The Ordinance specifies two types of patterns of visual markers:  dots or other isolated shapes that are at least one-quarter inch in diameter and spaced at no more than a two-inch by two-inch pattern; or lines that are at least one-eighth inch wide and spaced no more than two inches apart.  MGO § 28.129(4).

[6] The Associations' challenge to the Ordinance appears to be limited to its application to "public buildings" and "places of employment," as defined by Wis. Stat. § 101.01(11) and (12).  That is, the Associations do not argue that Wis. Stat. § 101.02(7r)(a) preempts the Ordinance's application to buildings that are not subject to the statewide commercial building code.

constructing, altering, or adding to" commercial buildings that do not strictly conform to the statewide commercial building code, which contains a chapter governing "glass and glazing" and does not mandate the use of bird-safe glass or design features. The City countered that zoning ordinances are not included within the scope of local ordinances that § 101.02(7r)(a) preempts, and that the Ordinance is a valid "form-based" zoning ordinance adopted pursuant to the City's zoning powers under WIS. STAT. § 62.23(7).[7] The Associations disagreed that zoning ordinances are exempt from preemption under § 101.02(7r)(a), and further argued that the Ordinance cannot be considered a zoning ordinance—either because Wisconsin law does not recognize the validity of form-based zoning or because the subject matter of the Ordinance is more similar to a building code than it is to a form-based zoning ordinance.

¶9      After examining the text of WIS. STAT. § 101.02(7r)(a), surrounding and closely related statutes, the statute's purpose, and statutory and legislative history, the circuit court concluded that § 101.02(7r)(a) exempts zoning ordinances from its preemptive effect. The court also concluded that the Ordinance is a valid form-based zoning ordinance that regulates building façade materials, and that it is distinct from a building code, which sets standards to ensure that buildings are structurally sound and safe for human occupation. Accordingly, the circuit court

---

[7] One authority has described "form-based zoning" as a "land development regulatory tool that places primary emphasis on the physical form of the built environment," and that may include "architectural regulations" that govern "building styles, details, and materials … and the ways in which they can be incorporated into various building elements such as walls, windows, fences, and roofs." Robert J. Sitkowski & Brian W. Ohm, *Form-Based Land Development Regulations*, 38 Urban Lawyer 163, 164-65 (2006) (citations omitted). Form-based zoning is "based on the theory that [such] design controls" can "resolve inconsistencies between land uses." *See Town of Rhine v. Bizzell*, 2008 WI 76, ¶17 n.6, 311 Wis. 2d 1, 751 N.W.2d 780 (citations omitted).

The parties to this appeal dispute whether Wisconsin statutes authorize cities to engage in form-based zoning, but, as discussed below, we need not resolve that dispute because our conclusion is not based on the concept of form-based zoning.

granted summary judgment in the City's favor and dismissed the Associations' complaint.

¶10 The Associations appealed the circuit court's decision. Following briefing by the parties, we held oral arguments, which were helpful in clarifying the issues on appeal.

## DISCUSSION

¶11 "Cities are creatures of the state legislature and have no inherent right of self-government beyond the powers expressly granted to them." ***Madison Teachers, Inc. v. Walker***, 2014 WI 99, ¶89, 358 Wis. 2d 1, 851 N.W.2d 337.

¶12 To that end, the state legislature has conferred broad powers to Wisconsin cities through state constitutional amendments and statutes, which provide cities with greater autonomy over local affairs. ***Id.*** Article XI, § 3(1) of the Wisconsin Constitution, referred to as the "Home Rule Amendment," vests cities with the right to "determine their local affairs and government, subject only to [the state] constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village." WIS. CONST. art. XI, § 3(1). WISCONSIN STAT. §§ 62.04 and 62.11(5), in turn, endow cities with police powers, such that they possess all police powers not expressly denied to them. *See **Wisconsin's Env't Decade, Inc. v. DNR***, 85 Wis. 2d 518, 531-33, 271 N.W.2d 69 (1978). In addition to this general grant of police power, WIS. STAT. § 62.23(7) and other statutes confer the power to zone, which is a subset of the police power.

¶13 Despite these broad grants of power, a city's ability to regulate matters of purely local concern, as well as matters that implicate a "mixed bag" of local and statewide concerns, may be limited by legislative enactments. *See **Adams v. State***

*Livestock Facilities Siting Rev. Bd.*, 2012 WI 85, ¶31, 342 Wis. 2d 444, 820 N.W.2d 404; *see also* **DeRosso Landfill Co., Inc. v. City of Oak Creek**, 200 Wis. 2d 642, 651, 547 N.W.2d 770 (1996). If the legislature has chosen to legislate on matters that are a mixed bag of local and statewide concerns, the legislation preempts a local ordinance if: (1) the legislature has expressly withdrawn the local government's authority to act; (2) the local ordinance logically conflicts with the state legislation; (3) "it defeats the purpose of the state legislation"; or (4) "it violates the spirit of state legislation." *DeRosso Landfill Co.*, 200 Wis. 2d at 651-52. Generally, the question of preemption is "one that must be answered with regard to the unique statutory scheme at issue." *Scenic Pit LLC v. Village of Richfield*, 2017 WI App 49, ¶8, 377 Wis. 2d 280, 900 N.W.2d 84.

¶14   Here, the parties agree that WIS. STAT. § 101.02(7r)(a) addresses a mixed bag of local and statewide concerns, and further, that the legislature clearly intended to preempt some aspects of the City's authority when it enacted § 101.02(7r)(a). The parties further agree that the question of what is preempted by that statute turns on the proper interpretation of provisions in WIS. STAT. ch. 101, which delegate authority to the state department of safety and professional services ("DSPS") to promulgate a statewide commercial building code and limit local authority in that area. We begin by briefly summarizing some of these key provisions and the related administrative regulations, and we then address the parties' arguments about § 101.02(7r)(a) and the Bird-Safe Glass Ordinance that is at issue in this case.

## I. Legal Background on the Legislative Delegation of Authority to DSPS to Adopt a Statewide Commercial Building Code

¶15   As pertinent here, the legislature has provided that DSPS "has such supervision of every … place of employment and public building in this state as is

7

necessary adequately to enforce and administer all laws and all lawful orders requiring such … place of employment or public building to be safe." WIS. STAT. § 101.02(15)(a). In this context, WIS. STAT. ch. 101 defines the term "safe" to mean "such freedom from danger to the life, health, safety or welfare of employees or frequenters, or the public," "and such reasonable means of notification, egress and escape in case of fire, and such freedom from danger to adjacent buildings or other property, as the nature of the … place of employment, or public building, will reasonably permit." WIS. STAT. § 101.01(13).

¶16    To that end, the legislature has directed DSPS to adopt a statewide commercial building code that will render places of employment and public buildings safe. *See* WIS. STAT. § 101.02(15)(j) ("[DSPS] shall ascertain, fix and order such reasonable standards or rules for constructing, altering, adding to, repairing, and maintaining public buildings and places of employment in order to render them safe."); *see also* WIS. STAT. § 101.01(1g) (defining the "[c]ommercial building code" as "the code adopted by [DSPS] under this subchapter [WIS. STAT. §§ 101.01-101.599] for the design, construction, maintenance, and inspection of public buildings and places of employment"). The statewide commercial building code that has been adopted by DSPS is found in WIS. ADMIN CODE chs. SPS 361-366. For convenience, we sometimes refer to it as the "statewide code" in this opinion.

¶17    Prior to 2014, state statutes allowed local governments to pass local building codes that were stricter than the statewide code. WISCONSIN STAT. § 101.02(7)(a) specifically provided (and continues to provide) that "[n]othing contained in this subchapter [WIS. STAT. §§ 101.01-101.599] may be construed to deprive the common council … of any … city … of any power or jurisdiction over or relative to any place of employment or public building …," so long as the local

8

standards did not conflict with the statewide code. And the DSPS regulations that implemented this provision also recognized that local governments could pass ordinances that imposed stricter building code standards. *See* WIS. ADMIN. CODE § SPS 361.03(5)(a)1. (August 2014) ("pursuant to s. 101.02(7), Stats," with exceptions not material here, "a city … may enact and enforce additional or more restrictive standards for public buildings and places of employment, provided the standards do not conflict with [the statewide] code"). DSPS regulations also unequivocally provided that "[n]othing in this code affects the authority of any municipality to enact and enforce standards relative to land use, zoning or regulations under … 62.23(7), Stats." *See* § SPS 361.03(5)(a)2. (August 2014).

¶18 The legislature enacted 2013 Wis. Act 270 in April 2014. Among other things, Act 270 created a "building code council," separate from DSPS, that is charged with "review[ing] the rules relating to constructing, altering, adding to, repairing, and maintaining public buildings and buildings that are places of employment" and "mak[ing] recommendations to the department pertaining to these rules" and related matters. *See* Act 270, §§ 1, 4 (creating WIS. STAT. §§ 15.407(18), 101.023). As we understand it, the "the rules" that the commercial building code council is charged with reviewing are those found in the statewide commercial building code.

¶19 2013 Wis. Act 270 also created WIS. STAT. § 101.02(7r)(a), which contains the preemption language at issue in this case. That language provides that, with exceptions that are immaterial here:

> Notwithstanding sub. (7)(a), [which, as stated, preserves the "power or jurisdiction" of cities "relative to" public buildings and places of employment,] no … city … may enact or enforce an ordinance that establishes minimum standards for constructing, altering, or adding to public buildings or buildings that are places of employment unless

> that ordinance strictly conforms to the applicable rules in sub. (15)(j) [which, as stated, authorizes DSPS to adopt a statewide commercial building code]….

*See* Act 270, § 2 (creating § 101.02(7r)(a), which has not been amended in a manner significant to this appeal since Act 270 was passed).

¶20    Following the passage of 2013 Wis. Act 270, DSPS modified its regulations regarding local authority to make the regulations consistent with Act 270's amendments to WIS. STAT. ch. 101. *See* CLEARINGHOUSE RULE 16-094, https://docs.legis.wisconsin.gov/code/register/2018/748b/register/final/cr_16_094_ rule_text/cr_16_094_rule_text.pdf; *see also* WIS. ADMIN. CODE ch. SPS 361 (April 2018). The revisions to the regulations reflect the agency's interpretation of WIS. STAT. § 101.02(7r)(a). *See* CLEARINGHOUSE RULE 16-094 at 4-5 (stating that DSPS's revisions "[u]pdate[] [§] SPS 361.03(5)(a) to incorporate requirements from 2013 Wisconsin Act 270, which states that no [municipality] may enact or enforce an additional or more restrictive ordinance for a public building or building that is a place of employment"); *see also* DSPS Note to § SPS 361.03(5)(a)1. (reflecting that Act 270 "established a uniform commercial [building] code").

¶21    DSPS made substantive revisions to the regulation that had formerly stated that municipalities could enact stricter standards than those found in the statewide commercial building code. As revised, DSPS reversed course on that issue, consistent with the new preemption provision found in WIS. STAT. § 101.02(7r)(a). Thus, as revised, WIS. ADMIN. CODE § SPS 361.03(5)(a)1. now provides that, with exceptions that are inapplicable here, "no city, village, or town may enact or enforce an additional or more restrictive local ordinance that establishes minimum standards for constructing, altering, or adding to public buildings or buildings that are places of employment."

¶22 In contrast, at the same time that DSPS made these substantive revisions to Wis. Admin. Code § SPS 361.03(5)(a)1., it made only technical revisions to subdiv. (5)(a)2., which addresses municipal zoning authority. DSPS's revisions made to subdiv. (5)(a)2. did not alter the approach to local zoning practices. As revised, subdiv. (5)(a)2. now provides: "Nothing in chs. SPS 361 to 366 affect the authority of any municipality to enact or enforce standards relative to land use, zoning, or regulations under … 62.23(7), Stats." *See* § SPS 361.03(5)(a)2. (as amended by Clearinghouse Rule 16-094).

## II. The Parties' Arguments

¶23 Having summarized the pertinent statutes and administrative regulations and their history, we now address the parties' arguments. We first interpret Wis. Stat. § 101.02(7r)(a), and we then apply that interpretation to determine whether the City's Ordinance is preempted by § 101.02(7r)(a).

## A. Interpretation of Wis. Stat. § 101.02(7r)(a)

¶24 As stated, the parties agree that this case primarily presents a matter of statutory interpretation, which is a question of law. *Nowell v. City of Wausau*, 2013 WI 88, ¶19, 351 Wis. 2d 1, 838 N.W.2d 852. When interpreting a statute, we begin with its language. *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We read the language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely related statutes," and consistent with its purpose. *Id.*, ¶¶46, 48. We also examine the history of the statute when determining the meaning of its terms. *Force v. American Fam. Mut. Ins. Co.*, 2014 WI 82, ¶31, 356 Wis. 2d 582, 850 N.W.2d 866.

¶25    We begin with the language of WIS. STAT. § 101.02(7r)(a).   As mentioned, that paragraph provides that, with exceptions that are inapplicable here, local governments are prohibited from enacting ordinances "that establish[] minimum standards for constructing, altering, or adding to public buildings or buildings that are places of employment," unless the local ordinance "strictly conforms to the applicable rules under sub. (15)(j)."

¶26    In their briefing, the Associations argue that the statute is "plain" and susceptible to only one reasonable interpretation—it prohibits local governments from adopting any ordinance that "falls under [the language of] that statute"—and that there is no language in WIS. STAT. ch. 101 that specifically exempts zoning ordinances from this prohibition.  We understand this argument to be aimed at the circuit court's analysis, which accepted the City's argument that the statute exempts zoning ordinances from its preemptive effect.

¶27    This argument does not resolve the issue on appeal.  We agree, of course, with the unremarkable assertion that the statute prohibits local governments from adopting ordinances that "fall under [the language of] that statute."  It is also true that there is no language in WIS. STAT. ch. 101 that unambiguously exempts zoning ordinances from the preemptive effect of WIS. STAT. § 101.02(7r)(a).  But the interpretive question at issue in this case is how to determine whether a local ordinance sets "minimum standards for constructing … public buildings."  *See* § 101.02(7r)(a).  The assertion that ordinances that "fall under [the language of] that

statute" are preempted by the statute does nothing to identify the types of local ordinances that come within the ambit of that language and are thus preempted.[8]

¶28    Throughout the course of this appeal, we perceive the Associations to have offered two differing interpretations of the meaning and breadth of the phrase "minimum standards for constructing … public buildings." *See* WIS. STAT. § 101.02(7r)(a). Under one interpretation, which was advanced most prominently in their briefing, the statute would broadly preempt any "minimum standards" that pertain in any way to the construction of public buildings, regardless of the content or purpose of those standards, unless the local standards strictly conform to the statewide commercial building code. The other interpretation, which appears to be much narrower, emerged most prominently at oral argument. Under this narrower interpretation, not all locally enacted minimum standards relating to the construction of public buildings would be preempted by § 101.02(7r)(a)—as we understand it, the preemptive effect of the statute would be limited to those "minimum standards" that address "building code issues."[9] For its part, the City appears to agree with the narrower interpretation to the extent that it means § 101.02(7r)(a) preempts only those minimum standards that are the proper subject of the statewide code.

¶29    We briefly discuss these two interpretations, explaining why the narrower interpretation is the more reasonable interpretation of WIS. STAT.

---

[8] We recognize that WIS. STAT. § 101.02(7r)(a) addresses three activities (constructing, altering, or adding to) regarding two different categories of buildings (public buildings and buildings that are places of employment). At times in this opinion, we sometimes use shorthand and refer to the "construction" of "public buildings." We use this shorthand for ease of reading, but in so doing, we do not mean to suggest a limitation on the statute such that it does not also apply to buildings that are places of employment, or to altering or adding to such buildings.

[9] As discussed further in the following section, at oral argument, the Associations proposed a test to determine whether a local ordinance establishes a building code standard, and that test ultimately turns on whether the ordinance addresses the same topic as any existing provision in the statewide code.

§ 101.02(7r)(a). We conclude that the legislature intended the local "minimum standards" that are preempted by § 101.02(7r)(a) to be limited to building code standards. To this end, our interpretation differs in one significant respect from some of the arguments advanced by the parties—the parties' arguments focus in significant part on whether a challenged ordinance constitutes a zoning ordinance, and our interpretation instead asks whether it is effectively a building code.

¶30 As stated, the Associations' broad interpretation of the phrase "minimum standards for constructing … public buildings," would encompass any local "minimum standards" that pertain in any way to the construction of public buildings, regardless of the content or purpose of those standards. At first glance, such an interpretation has intuitive appeal if language in WIS. STAT. § 101.02(7r)(a) is considered in isolation—standing alone, the phrase "minimum standards for constructing … public buildings" could reasonably be read to encompass any standard that imposes any restriction on the construction of a public building. However, there are two primary reasons that this interpretation is much less reasonable when the statutory language is considered as a whole, and alongside closely related statutes.

¶31 First, when WIS. STAT. § 101.02 is read as a whole and along with surrounding statutes, it is apparent that a primary focus is DSPS's authority to adopt a statewide commercial building code, which the legislature intended to be uniform throughout the state. But it is also apparent that the legislature contemplated that local governments would continue to have significant authority over public buildings, even after the establishment of a uniform code. Paragraph 101.02(7)(a) directs that nothing in WIS. STAT. §§ 101.01-101.599 should be "construed to deprive" local governments of "any power or jurisdiction over or relative to" any public building. To be sure, § 101.02(7r)(a) carves out an exception to para. (7)(a)'s

acknowledgement of broad local authority, yet in doing so it explicitly references para. (15)(j). And, as noted, DSPS promulgated the statewide code pursuant to the authority granted in para. (15)(j).

¶32    The pertinent language delegating that authority to DSPS uses language that is identical to the language of the preemption statute:  WIS. STAT. § 101.02(15)(j) provides that DSPS "shall ascertain, fix, and order such reasonable *standards* or rules *for constructing*, *altering*, *adding to … public buildings* … in order to render them safe," (emphasis added); and § 101.02(7r)(a) prohibits local governments from enacting or enforcing an ordinance "that establishes minimum *standards for constructing, altering, or adding to public buildings*" unless the local ordinance "strictly conforms" to the standards adopted by DSPS, (emphasis added). The parallels and cross references between these paragraphs suggest that the local minimum standards preempted by § 101.02(7r)(a) are those that are of like kind to the standards set forth in the statewide commercial building code promulgated by DSPS, rather than any standards regulating the construction of public buildings. *See Phelps v. Physicians Ins. Co. of Wis.*, 2005 WI 85, ¶58, 282 Wis. 2d 69, 698 N.W.2d 643 ("Typically, a term used in multiple subsections within a statute is given the same meaning."); *State v. Dismuke*, 2001 WI 75, ¶21, 244 Wis. 2d 457, 628 N.W.2d 791 ("Words or phrases appearing in the same statute are given the same meaning.").

¶33    Indeed, another provision in WIS. STAT. ch. 101 appears to distinguish between building code standards and other types of standards, including standards addressing "aesthetic considerations" that relate to "color and texture and design considerations that do not relate to health and safety."  *See* WIS. STAT. § 101.02(7w)(b), (a).  Significantly, para. (7w)(b) appears to recognize that local ordinances can address aesthetic considerations for the interiors or exteriors of

public buildings. And like para. (15)(j), subds. (7)(w)(a) and (b) suggest that "the minimum standards" referenced in para. (7r)(a) do not encompass any and all "minimum standards for constructing … public buildings," and are instead limited to building code standards.

¶34    Second, statutory language is to be read alongside related statutes. Here, it is illuminating to read the preemption language of WIS. STAT. § 101.02(7r)(a) alongside other express grants of authority to local governments. Specifically, WIS. STAT. ch. 62, which governs cities, provides that WIS. STAT. §§ 62.01 to 62.26 "shall be liberally construed in favor of the rights, powers and privileges of cities to promote the general welfare, peace, good order and prosperity of such cities and the inhabitants thereof." *See* § 62.04. Subsection 62.11(5) provides that the police powers granted to cities "shall be limited only by express language." Paragraph 62.23(7)(am) provides that a city may "regulate and restrict" "the height, number of stories and size of buildings," among other things, "[f]or the purpose of promoting health, safety, morals or the general welfare of the community," and that "[t]his subsection and any ordinance … enacted or adopted under this section, shall be liberally construed in favor of the city and as minimum requirements adopted for the purposes stated." Paragraph 62.23(7)(b) specifically pertains to regulations regarding the construction and alteration of buildings—it grants cities the authority to "divide the city into districts …; and within such districts … regulate and restrict the erection, construction, reconstruction, alteration or use of buildings, structures or land." And para. 62.23(7)(g) also contains its own preemption language, which provides that "[w]herever the regulations made under authority of this section … impose other higher standards than are required in any other statute or local ordinance or regulation, the provisions of the regulations made under authority of this section shall govern."

16

¶35    There can be no dispute that cities use the authority granted by these statutes to regulate certain aspects of the "construction" of public buildings. By way of example, Madison General Ordinances impose numerous regulations regarding the height, number of stories, and size (among other features) of buildings in commercial and mixed-use districts.[10]  Likewise, Madison General Ordinances impose numerous regulations regarding the appearance of commercial building façades, including ordinances that regulate the design and materials used to construct such façades.[11]

¶36    Turning back to WIS. STAT. § 101.02(7r)(a), an overbroad interpretation of the phrase "minimum standards for constructing … public buildings" would prevent cities from regulating any aspect of the construction of public buildings, including in manners that WIS. STAT. § 62.23(7) explicitly authorizes, even if the local regulations do not intrude into the province of building code issues. Generally speaking, when multiple statutes seemingly address the same subject matter, "we properly read the two statutes *in pari materia* such that both will be operative," and to avoid conflicts if a reasonable non-conflicting interpretation is possible. *State v. Allen*, 200 Wis. 2d 301, 309, 546 N.W.2d 517 (Ct. App. 1996).

---

[10]  *See, e.g.*, MGO § 28.065(3), (4) (imposing dimensional requirements, regulating height and number of stories, and regulating maximum square footage for new buildings and certain additions in traditional street shopping districts); MGO § 28.066 (5), (6) (same for mixed use center districts); MGO § 28.067 (3), (4) (same for commercial corridor-transitional districts); MGO § 28.068 (3), (4) (same for commercial center districts).

[11]  One such example is MGO § 28.060(2)(b), which requires "façade articulation" that is "[c]onsistent with the design of traditional storefront buildings" on new buildings and major expansions in mixed-use and commercial districts. A non-exhaustive list of other examples includes § 28.060(2)(d), which prescribes the number and placement of door and window openings in nonresidential uses at ground floor level; § 28.060(2)(e) and (f), which requires screening of certain equipment and service areas; § 28.060(2)(g), which requires the use of specified "durable, high-quality materials" for certain building features and requires consideration of "the use, amount, placement and relationship of each material as part of a comprehensive palette of building materials; and MGO § 28.173, which prescribes acceptable "forms" for mixed-use and non-residential buildings.

Applying this canon here supports a reasonable, non-conflicting interpretation of § 101.02(7r)(a) under which the minimum standards that it was enacted to preempt are limited to those that address building code issues.

¶37  For all these reasons, we conclude that WIS. STAT. § 101.02(7r)(a) is most reasonably interpreted as withdrawing local authority to enact or enforce minimum standards that address building code issues that are not in strict conformity with the statewide commercial building code.  The evident purpose of § 101.02(7r)(a) is to establish a statewide code that is uniform across the state, and local ordinances that impose different building code standards logically conflict with the statute, defeat its purpose, and violate its spirit.  *DeRosso Landfill Co.*, 200 Wis. 2d at 651-52.  Although a broader interpretation of § 101.02(7r)(a)'s preemptive effect might be reasonable if some of the language of that paragraph were considered in isolation, it is much less reasonable when the statute is considered in context with surrounding and closely related statutes and other statutes pertaining to local authority.

¶38  Before applying this interpretation to the specific ordinance at issue in this appeal, we briefly comment on some arguments offered by the City.  It appears that the City may be asking us to go further and adopt an interpretation that categorically exempts all properly promulgated zoning ordinances from the preemptive effect of WIS. STAT. § 101.02(7r)(a).  As we understand the City's argument, no ordinance that is denominated as a zoning ordinance would be preempted, regardless of the content or purpose of the zoning ordinance or the subject matter it seeks to regulate.

¶39     On the one hand, the City's interpretation finds support in the legislative history of WIS. STAT. § 101.02(7r)(a).[12]  It also finds support in the history of the enacting regulations, and in particular, DSPS's retention of the substance of WIS. ADMIN. CODE § SPS 361.03(5)(a)2. following the enactment of § 101.02(7r)(a).[13]  We observe that, pursuant to the agency rulemaking procedures in place at the time that § SPS 361.03(5)(a)1. was revised, the legislature and its joint committee for review of administrative rules had the opportunity to review the revised code provision before it became law, and could have objected to the failure to make a substantive revision to the rule addressing zoning as contrary to state law, but did not do so.  *See* WIS. STAT. § 227.19(4), (5).

¶40     On the other hand, there are at least two potential problems with a categorical approach.  As the Associations point out, the legislature could have included express language that exempts zoning ordinances when it enacted WIS. STAT. § 101.02(7r)(a), and it did not do so.  Additionally, if all ordinances that were promulgated as zoning ordinances were exempt from preemption under

---

[12] The City points to the following legislative history in support of its interpretation. Senator Terry Moulton was one of the sponsors of 2013 Wis. Act 270, and the language of WIS. STAT. § 101.02(7r)(a) was drafted in response to a drafting request that his chief of staff emailed to staffers at the Legislative Reference Bureau.  *See* Act 270, drafting files at 14, https://docs.legis.wisconsin.gov/2013/related/drafting_files/wisconsin_acts/2013_act_270_sb_61 7/02_sb_617/13_2184df_pt01of02.pdf.  In the drafting request, Senator Moulton's chief of staff explained that the proposed legislation should establish a "Uniform Commercial Building Code," and he attached a document to the email delineating the scope of the legislation that he was proposing.  *Id.* at 14-15.  A footnote in the document stated:  "Building code pertains to the design, construction and alteration of buildings and structures.  Not to interfere with a municipality's zoning code pertaining to land use, setbacks, building height, materials and other general planning and development issues…."  *Id.* at 15.  This drafting request is significant because it draws a distinction between building code standards and those standards created by zoning regulations, and because it directed the Legislative Reference Bureau to draft statutory language that would preempt the former and leave the latter untouched.

[13] *See supra*, ¶¶20-22.  As stated, WIS. ADMIN. CODE § SPS 361.03(5)(a)2. provides: "Nothing in chs. SPS 361 to 366 affect the authority of any municipality to enact or enforce standards relative to land use, zoning or regulations under … 62.23(7), Stats."

§ 101.02(7r)(a) regardless of their purpose or content, local governments could establish more restrictive or conflicting minimum building code standards under the guise of zoning, thereby evading the statute's evident goal of creating a uniform statewide commercial building code. It would be surprising if the proper interpretation of § 101.02(7r)(a) would allow a local government to avoid its preemptive effect by denominating as a zoning ordinance what is in reality a building code standard that conflicts with or is stricter than the statewide commercial building code.

¶41 Under the circumstances here, we need not decide whether the City's categorical approach is correct in order to resolve this dispute. That is, for purposes of deciding this appeal, we need not decide whether a determination that a local ordinance was (or could have been) promulgated as a zoning ordinance is necessarily dispositive of whether the ordinance is preempted by WIS. STAT. § 101.02(7r)(a). We need not reach this question because, as discussed in the following section, the Associations have not provided a basis for concluding that the Bird-Safe Glass Ordinance, which was promulgated as a zoning ordinance, is effectively a building code standard that is preempted by § 101.02(7r)(a).[14]

### B. Application to the Bird-Safe Glass Ordinance

¶42 Having determined that WIS. STAT. § 101.02(7r)(a) was meant to preempt local ordinances that establish minimum building code standards that do

---

[14] For these reasons, we also need not address the parties' dispute about whether the Bird-Safe Glass Ordinance constitutes a proper exercise of the City's zoning authority. As we have explained, cities have broad authority to regulate local issues, including but not limited to zoning authority, and we have not adopted a categorical approach under which a determination that an ordinance is a zoning ordinance is dispositive of whether it is preempted by WIS. STAT. § 101.02(7r)(a).

not strictly conform to those in the statewide code, we turn to consider whether the Bird-Safe Glass Ordinance constitutes a local building code standard.

¶43　As discussed above, the Ordinance pertains to new construction and to the expansion of existing buildings, and it requires the treatment of certain exterior glass surfaces to increase their visibility to birds, thereby reducing the risk of fatal or injury-causing collisions. MGO § 28.129(2), (1). The Ordinance identifies several permissible methods to increase the visibility of glass. It may be treated with a pattern of visual markers consisting of dots or lines of specified size and spacing, or other mitigation measures may be used, including low reflectance opaque materials, non-glass double skin façades, metal screens, solar shading, and insect screens. § 28.129(4).

¶44　As noted, the question is whether the Ordinance establishes what is effectively a building code standard, even though it was passed as a zoning ordinance. Much of our questioning at oral argument was related to this topic— what is the essence of a building code standard, and what test can we use to determine whether a local ordinance is effectively a building code standard, even if it has been labelled as something else? These are not easy questions to answer.

¶45　The Associations have not advanced a clear definition of what makes a standard a building code standard. Instead, at oral argument, the Associations proposed a test that turns on whether the local standard addresses the same subject matter as a standard that DSPS has included in the statewide code. If so, the Associations contend, the local standard constitutes a building code standard, and the court would then ask whether the local standard "strictly conforms" to the standards that DSPS has adopted addressing that subject matter in the statewide building code. The Associations' attorney acknowledged that, under its proposed

test, a court would not be able to determine whether the legislature had withdrawn local authority to regulate certain issues without determining whether DSPS had actually addressed that subject matter in the statewide commercial building code.

¶46 According to the Associations, the application of their proposed test demonstrates that the Bird-Safe Glass Ordinance is preempted by WIS. STAT. § 101.02(7r)(a). They argue that the Ordinance establishes a building code standard because it addresses the same subject matter as a standard that DSPS has included in the statewide code; they further argue that it does not strictly conform to the Code because it requires something more on that subject matter than what DSPS has required to ensure that public buildings are safe. To evaluate the Associations' application of their proposed test, we must first provide additional background on the statewide code and the provisions in that code that regulate glass.

¶47 As discussed, the statewide commercial building code that was adopted by DSPS is found in WIS. ADMIN. CODE chs. 361-366. In fixing the standards in the statewide code, DSPS adopted portions of various international codes developed by third parties, including, as relevant here, portions of the 2015 version of the International Building Code (the "international code" or "IBC"). *See* § SPS 361.05(1).[15]

---

[15] The international code is copyrighted by the International Code Council, Inc. (ICC). Although WIS. ADMIN. CODE § SPS 361.05 has adopted it by reference, its provisions are not actually reprinted in the administrative regulations and must be accessed through other means. According to the notes to § SPS 361.05, a copy of the international code is on file in the offices of DSPS and at the legislative reference bureau, copies may be purchased from the ICC, and it may be viewed (but not printed) free of charge on the ICC's website, at https://codes.iccsafe.org.

¶48 The international code contains a chapter titled "Glass and Glazing,"[16] which was adopted by DSPS and addresses "the materials, design, construction, and quality of glass … for exterior and interior use in both vertical and sloped applications in buildings and structures." *See* IBC, ch. 24, available at https://codes.iccsafe.org/content/IBC2015P4/chapter-24-glass-and-glazing (last visited Sept. 26, 2023). Generally speaking, the provisions of this chapter seek to ensure that glass is of adequate thickness, adequately supported, and capable of resisting load combinations and bearing the weight of the structural elements of which it is a part.[17] Accordingly, the statewide commercial building code and the Bird-Safe Glass Ordinance both address the general subject of glass that is used in the construction of the exteriors of public buildings. However, the Associations do not appear to argue that the Ordinance can be said to address the same subject matter as the statewide code on that generalized of a basis.

¶49 Instead, the Associations argue that the Ordinance establishes a building code standard because it addresses the same subject matter as a specific section in the international code's glass and glazing chapter, IBC § 2403.1, which addresses markings on glass. That section is titled "Identification," and it requires, among other things, that each pane of glass bear a "manufacturer's mark" that designates the type and thickness of the glass or glazing material:

---

[16] "Glazing" is defined as "the action, process, or trade of fitting windows with glass." *Glazing*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/glazing (last visited Sept. 26, 2023).

[17] By way of example, IBC § 2403.2 requires detailed drawings, analysis, or test data ensuring safe performance when one or more sides of a pane of glass are not firmly supported; IBC § 2403.3 governs framing and describes what it means for a pane of glass to be firmly supported; IBC § 2403.4 addresses differential deflection of adjacent unsupported edges that are adjacent to walking surfaces; IBC § 2403.5 addresses the thickness of glass in louvered windows and jalousies; and IBC § 2404 addresses wind, snow, seismic, and dead loads on different installations of glass.

> Each pane shall bear the manufacturer's mark designating the type and thickness of the glass or glazing material. The identification shall not be omitted unless approved and an affidavit is furnished by the glazing contractor certifying that each light is glazed in accordance with approved construction documents that comply with the provisions of this chapter. Safety glazing shall be identified in accordance with [IBC §] 2406.3.

> Each pane of tempered glass, except tempered spandrel glass, shall be permanently identified by the manufacturer. The identification mark shall be acid etched, sand blasted, ceramic fired, laser etched, embossed or of a type that, once applied, cannot be removed without being destroyed.

> Tempered spandrel glass shall be provided with a removable paper marking by the manufacturer.[18]

Section 2403.1. The apparent purpose of this provision is to require that the qualities of glass panes that are used in construction are readily identifiable. This in turn helps ensure that panes installed in commercial buildings are of an appropriate type and thickness to be structurally sound such that the buildings of which they form a part are safe for employees, frequenters, and the public.

¶50 According to the Associations, the Bird-Safe Glass Ordinance establishes a building code because this provision from the international code addresses "markings" on glass, and one option for complying with the Ordinance is

---

[18] For more information on safety glazing and tempered glass, see Chris Campbell, *Safety Glass and Glazing - A Quick Reference Guide*, https://www.buildingcode.blog/blog/safety-glass-a-quick-reference-guide (last visited Sept. 29, 2023). According to that source, "safety glazing refers to glass panels or other materials that have been manufactured to reduce the likelihood of breaking and to minimize the safety risk if the material does break." *Id.* "Tempered glass" is one specific type of safety glazing. *Id.* Requirements for safety glazing are set forth in IBC § 2406. *Id.* That section specifically identifies hazardous locations in buildings that require safety glazing, such as glazing that is in certain doors, certain windows, certain guards and railings, and certain wet areas, and glazing that is adjacent to places including stairways, ramps, and the bottom of stairway landings. *Id.*

to add "a pattern of visual markers" beyond the mark that is required by IBC § 2403.1. Notably, the Associations' argument focuses exclusively on just one of several compliance options the Ordinance provides for treating glass—the placement of visual markers on the glass at specified intervals.[19]

¶51    As for the Ordinance's visual markers option, the Associations contend that this provision addresses the same subject matter as IBC § 2403.1, even though the mark required by § 2403.1 is different in appearance and purpose from the visual markers described in the Ordinance, and even though a pane of glass can both be marked as required by § 2403.1 and also have the pattern of visual markers specified in the Ordinance. According to the Associations, once DSPS has spoken on the general subject of marks and has determined that some kind of mark is required on panes of glass to protect human safety, local governments are preempted from requiring any other marks on glass, regardless of the nature or purpose of such marks.

¶52    We reject the Associations' proposed test because it fails to provide a meaningful and consistent standard that courts can use to determine whether a local ordinance establishes a building code standard that is preempted. The problem with the test, as the Associations have explained and attempted to apply it, is that a court's conclusion about whether an ordinance addresses the same subject matter as the statewide commercial building code would necessarily depend on the level of generality at which the court describes the subject matter that is regulated by the local ordinance. At one end of the spectrum, a local zoning ordinance that requires

---

[19] As for the other compliance options specified in the Ordinance, the Associations do not develop any argument that these options address the same subject matter as any provision in the international code or any other provision in the statewide code, and therefore constitute a building code standard under the Associations' proposed test.

"façade articulation" on the exterior of mixed-use buildings could be described in general terms as regulating exterior walls, doors, and windows. If the court were to describe the subject matter of the ordinance with that level of generality, the court would be bound to conclude that it is preempted because the statewide code contains many provisions that address exterior walls, doors, and windows, and the façade articulation ordinance requires more than what is required by those statewide code provisions.[20] At the other end of the spectrum, the court could describe the subject matter of the local ordinance as regulating the aesthetic appearance of exterior walls, doors, and windows on certain buildings. If the court were to describe the subject matter with that level of precision, then the court would conclude that the façade articulation ordinance is not preempted because the statewide commercial building code does not address the aesthetic appearance of walls, doors, and windows.

¶53 As this example demonstrates, the Associations' proposed test is too malleable to produce results that are anything but arbitrary—the results would depend entirely on how any given court chooses to characterize the subject matter regulated by the local ordinance. The arbitrariness of the proposed test is illustrated in this very case. That is, if we were to choose to describe the subject matter regulated by the Ordinance as the "visibility of exterior glass," rather than "marks on glass," the Ordinance would not be preempted under the Associations' test (at least not based on IBC § 2403.1, which regulates "marks" but not "visibility").

¶54 The arbitrariness of the Association's proposed test is also illustrated by the inability of the Associations' attorney to give consistent answers at oral

---

[20] *See* IBC § 1010 (included in ch. 10 addressing "means of egress," and specifically regulating "doors, gates, and turnstiles," https://codes.iccsafe.org/content/ IBC2015P4/chapter-10-means-of-egress), and IBC ch. 14 (regulating "exterior walls," https://codes.iccsafe.org/ content/IBC2015P4/chapter-14-exterior-walls), in addition to IBC ch. 24, which, as discussed, regulates "glass and glazing."

argument about whether other Madison General Ordinances would be preempted under the test. By way of example, the attorney was asked whether an ordinance that required ground floor windows to be "clear or slightly tinted" would be preempted on the ground that Chapter 24 of the IBC regulates glass, generally, but does not specifically address tinting. At one point, the attorney asserted that "anything having to do with glass" would be preempted; at another point, the attorney indicated that the ordinance would not be preempted because he did not understand the statewide code to specifically address tinting; and at yet another point, the attorney indicated that he could not give a definitive answer and would have to further study the statewide code to determine whether it addresses the tinting of glass. We do not perceive the attorney's inability to answer to be the result of a lack of candor; we instead perceive it to be the result of problems that are baked into the Associations' proposed test.

¶55   We discern a more reliable and reasonable test to determine, for purposes of the preemption issue presented here, whether a local ordinance imposes a standard that is effectively a building code standard. This test takes into account the subject matter of the local ordinance, and also its specific content and its regulatory purpose. We inquire whether the local ordinance sets minimum standards that are meant to ensure that buildings are constructed in such a way that they are structurally sound, and are equipped with systems and components— whether electrical, gas, plumbing, mechanical, or some other—such that the buildings are safe for employees, frequenters, and the public. This test ties directly to the language of WIS. STAT. § 101.02(15)(j), which requires DSPS to adopt a statewide commercial building code consisting of "reasonable standards or rules for constructing … public buildings … in order to render them safe," and WIS. STAT. § 101.01(13), which defines the term "safe" to mean "such freedom from danger to

the life, health, safety or welfare of employees or frequenters, or the public," "and such reasonable means of notification, egress and escape in case of fire, and such freedom from danger to adjacent buildings or other property, as the nature of the … public building[] will reasonably permit." Whether the statewide code addresses similar topics as the local ordinance may be relevant to the inquiry, but it is not dispositive. Instead, courts must look at the specific content and purpose of the ordinance, bearing in mind the considerations that inform the statewide code.

¶56 Applying this test here, the Ordinance sets standards that relate in some respect to building materials, and building materials are a common subject of building codes. However, the standards set by the Ordinance are not meant to address the structural integrity of buildings or any of their systems or components. Nor is the Ordinance about making the buildings safe for employees, frequenters, and the public. Instead, the Ordinance's standards require the treatment of exterior glass windows in certain buildings, and its stated and evident purpose is to set standards that will make these exteriors visible to birds. We therefore conclude that the standards set by the Ordinance are not effectively a building code standard and are not preempted by WIS. STAT. § 101.02(7r)(a). Accordingly, we do not reach the question of whether the Ordinance's standards strictly conform to those in the statewide code.

## CONCLUSION

¶57 For the above stated reasons, we conclude that WIS. STAT. § 101.02(7r)(a) does not preempt the City's Bird-Safe Glass Ordinance. Accordingly, we affirm the circuit court order that granted summary judgment in the City's favor and dismissed this lawsuit.

*By the Court.—*Order affirmed.